Filed 1/13/21  In re G.M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re G.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>G.M.,<br><br>    Defendant and Appellant. | F081013<br><br>(Super. Ct. No. JVDL-18-000075)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from orders of the Superior Court of Stanislaus County.  Rubén A. Villalobos, Judge.

Suzanne M. Morris, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Franson, Acting P.J., Smith, J. and Snauffer, J.

Appellant G.M. appeals from the juvenile court's jurisdictional order sustaining the allegations of a Welfare and Institutions Code section 602 petition and from the dispositional order.[1] G.M.'s appointed counsel asked this court to review the record to determine whether there are any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.) G.M. was advised of his right to file a supplemental brief within 30 days of the date of filing of the opening brief. More than 30 days elapsed and we received no communication from G.M. Finding no arguable error that would result in a disposition more favorable to G.M., we affirm.

We provide the following brief description of the facts and procedural history of the case.[2] (See *People v. Kelly* (2006) 40 Cal.4th 106, 110, 124.)

On August 9, 2019, Modesto Police responded to a report of a battery on a transient man at a gas station. Officers arrived and found the injured victim, R.J., who reported he was hit and kicked repeatedly by "some Nortenos and Surenos." R.J. said his assailants accused him of insulting one of their girlfriends. R.J. had injuries to his shoulder, tire marks across his chest, fractured ribs, fractured vertebrae, a fractured cheek, a laceration on his back that required surgery, and a collapsed lung. He had surgery and spent an unspecified length of time in the hospital's intensive care unit.

Gas station surveillance video showed three cars arrive in succession at the station where R.J. was searching through trash cans. Several young males exited the cars and began to hit and kick R.J. After R.J. appeared to become unconscious, one of the minors stomped on his head. The assailants left the scene as a fourth vehicle arrived and ran over R.J.'s body and dragged him several feet. The fourth vehicle fled in the direction of the other cars.

---

[1] Unlabeled statutory references are to the Welfare and Institutions Code.

[2] The facts are drawn primarily from the detention report which was stipulated as the factual basis for G.M.'s admission.

Officers canvassed the area and found two of the cars involved in the assault. Both cars were reported stolen and one had what officers believed was G.M.'s gang moniker written on it. Officers reviewed videos posted on G.M.'s social media accounts and concluded that G.M. was the driver of one of the vehicles present during the assault and that he participated in the assault, though they identified other minors as those responsible for stomping on R.J.'s head and running him over. Officers viewed a live video on Instagram and determined the group of assailants was at one of the minors' homes and set up surveillance outside. A group of five young males left the home, acquired a stolen car, and were detained by officers. G.M. was driving.

In a statement to probation, G.M. expressed remorse for his involvement in the assault and stated he thought his friend was being attacked. G.M. also said he believed his actions escalated the situation.

On August 13, 2019, the Stanislaus County District Attorney filed a section 602 wardship petition, charging G.M. with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); count 1) and assault likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4); count 2). Each count further alleged G.M. personally inflicted great bodily injury in the commission of the offense pursuant to Penal Code section 12022.7, subd. (a).

On December 4, 2019, G.M. admitted count two of the pending section 602 petition with the Penal Code section 12022.7, subdivision (a) enhancement. At the time of his admission, the court advised G.M. there was a significant likelihood he would be committed to the Division of Juvenile Justice given the nature of the offense, while also noting the disposition would involve an individualized analysis of G.M.'s circumstance. Count one and the accompanying enhancement were dismissed in light of G.M.'s admission.

Prior to this case, G.M. had suffered four sustained section 602 petitions in Stanislaus County. On July 25, 2018, G.M. was declared a section 602 ward of the court

after violating Penal Code section 496, subdivision (a), misdemeanor receipt of a stolen car, and the court imposed a term of 45 days in juvenile hall and 11 days of electronic monitoring.

On October 2, 2018, G.M. was continued as a section 602 ward after violating Vehicle Code sections 2800.2, subdivision (a)—evading a police officer—and 10851, subdivision (a)—unlawfully taking or driving a vehicle. He was ordered to serve 100 days in juvenile hall. In that case, G.M. was driving a stolen vehicle when officers attempted a traffic stop. G.M. sped away from the officers and ran several red lights before crashing into a chain link fence.

On January 17, 2019, G.M. again was continued as a section 602 ward after again violating Vehicle Code section 10851 and was ordered to serve 120 days in juvenile hall and 30 days on electronic monitoring.

On March 27, 2019, G.M. again was continued as a section 602 ward after violating Penal Code section 496, subdivision (d), receiving stolen property, and was ordered to serve 298 days in juvenile hall and 30 days on electronic monitoring.[3]

Shortly after G.M. was released from juvenile hall to begin his term of electronic monitoring in the case dispositioned on January 17, 2019, G.M. removed his electronic monitor and committed the offense giving rise to the instant case.

Regarding disposition, the probation department recommended the court commit G.M. to the California Department of Juvenile Justice (DJJ). Probation considered out-of-home placement and a lengthy local commitment as alternatives to a DJJ commitment, but concluded DJJ was most appropriate to meet G.M.'s rehabilitative needs and to protect the community. Probation noted the violent and serious nature of the offense, G.M.'s multiple adjudications, his history of probation violations, his gang membership,

---

[3] The incident underlying this case occurred on February 26, 2019, and the section 602 petition was filed on February 28, 2019.

4.

and the danger he presented to the community and to the other minors in juvenile hall. Probation also noted that G.M. had a positive relationship with his mother and siblings, but sometimes would leave home for days and was not responsive to his mother's attempts at discipline. G.M. had negative peer influences who encouraged him to participate in crimes.

G.M. used to perform well in school, but once he started high school he began getting into trouble and fights at school. His school attendance and grades dropped. He admitted to probation he was a Norteno gang member and drank alcohol weekly and smoked marijuana when it was available.

However, in the month prior to his disposition in this case, he had been behaving better in juvenile hall. He was on the judge's honor roll and was generally reported to be programming well.

At his dispositional hearing, defense counsel asked the court to place G.M. at Aspiranet, an out-of-home placement in Turlock, rather than commit him to DJJ. In support of that recommendation, G.M. offered the testimony of gang expert, Jesse DeLaCruz. DeLaCruz was a former gang member who had been incarcerated for much of his youth, after which he earned a masters degree in social work with a focus on deviant behavior and later a doctorate in educational leadership, with a dissertation on gangs in the City of Stockton. In addition to offering perspective as a former gang member and prison inmate, DeLaCruz previously worked with parolees, started a sober living center, managed a program that housed people with mental disorders, and worked as a juvenile justice commissioner in Stanislaus County. DeLaCruz testified that G.M. was more likely to be rehabilitated at Aspiranet than at DJJ. DeLaCruz believed that G.M. was on the path toward rehabilitation in that he had been attending school and was working toward his GED or diploma; G.M. was on the judge's honor roll; and he had participated in self-help groups. Moreover, DeLaCruz noted G.M.'s youth and that his gang affiliation appeared to be relatively new and somewhat peripheral. DeLaCruz

expressed concern that G.M.'s youth made him particularly vulnerable to negative peer influences at the DJJ and increased the likelihood that he would become an entrenched gang member in that setting. In contrast, at Aspiranet, he could receive needed counseling and services without exposure to the same negative influences present at DJJ and he could be placed in a stable environment at the conclusion of the program.

After thoroughly discussing its reasons, the juvenile court agreed with probation's assessment. In committing G.M. to DJJ, the court stated that it had considered less restrictive alternatives, but because of the nature of the offense, G.M.'s rehabilitative needs, and his escalating juvenile justice history, less restrictive alternatives were not appropriate. In adopting probation's recommendation, the court concluded that G.M. was likely to benefit from the discipline and treatment provided by the DJJ.[4]

Having undertaken an examination of the entire record, we find no evidence of ineffective assistance of counsel or any other arguable error that would result in a disposition more favorable to G.M.

## **DISPOSITION**

The orders are affirmed.

---

[4] On January 30, 2020, the juvenile court ordered G.M. be committed to the DJJ. The court determined that the maximum term of confinement was 120 months, the aggregate of 84 months on the new section 602 findings and 36 months on all previous petitions. G.M. was awarded 476 days of credit for time served. G.M. filed a timely notice of appeal on March 20, 2020.